AO 106 (Rev. 04/10) Application for a Search Warrant



# UNITED STATES DISTRICT COURT

### for the
### Eastern District of Virginia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>A gray Saturn SUV bearing Virginia license plate UYE4379,<br>VIN: 3GSCL33P88S623549 | )<br>)<br>)<br>)<br>)<br>) |

Case No.   1:18-sw- 579

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A.

located in the _____Eastern_____ District of _____Virginia_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) & 846 | Conspiracy to distribute and possess with intent to distribute controlled substances. |

The application is based on these facts:
See attached Affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

AUSAs Michael Ben'Ary/Colleen Garcia

_____
*Applicant's signature*

ATF Special Agent Zachary Mikkelson
*Printed name and title*

Sworn to before me and signed in my presence.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge
*Judge's signature*

Date:   _____09/19/2018_____

City and state: Alexandria, VA

The Hon. Theresa Carroll Buchanan - U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

*Property to be searched*

The property to be searched is a gray Saturn SUV bearing Virginia license plate UYE4379, VIN:

3GSCL33P88S623549.

## ATTACHMENT B

*Items to be Seized*

The items to be seized are fruits, evidence, records and information relating to, contraband, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846(a) (distribution and possession with intent to distribute cocaine and other controlled substances, and conspiracy to distribute cocaine and other controlled substances) including, but not limited to:

a. Controlled substances, packaging materials, indicia of distribution, records and documents, receipts, notes ledgers and other papers including any computerized or electronic records including cellular telephones, relating to the ordering, purchase or possession of controlled substances;

b. U.S. currency and other illicit gains from the distribution of controlled substances;

c. Address and/or telephone books and papers, including computerized or electronic address and/or telephone records reflecting names, addresses and/or telephone numbers;

d. Books, records, receipts, bank statements, and records, money drafts, and any other items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money or other assets including, but not limited to, controlled substances;

e. Documents and papers evidencing ownership of proceeds from the sale of controlled substances, storage and location of such assets and facilities to safely store and secure such items, such as safes, to include lock boxes, and strong boxes;

f.   Photographs, in particular, photographs of controlled substances and photographs of
     individuals possessing controlled substances and photographs showing the association
     of individuals;

g.   Indicia of occupancy, residence, and/or ownership of the premises described herein,
     including, but not limited to, utility and telephone bills, cancelled envelopes, and
     keys;

h.   Cellular phones, computers, and other electronic storage media or digital devices;

i.   For any electronics searched, any conversations, whether through text messages or
     other applications, where FINUCAN, FERRELL, and/or JOHNSON discusses the
     purchase and sale of cocaine and other controlled substances;

j.   For any electronics searched, any photographs of controlled substances.

     For any computer or storage medium whose seizure is otherwise authorized by
this warrant, and any computer or storage medium that contains or in which is stored records or
information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.   evidence of who used, owned, or controlled the COMPUTER at the time the things
     described in this warrant were created, edited, or deleted, such as logs, registry
     entries, configuration files, saved usernames and passwords, documents, browsing
     history, user profiles, email, email contacts, "chat," instant messaging logs,
     photographs, and correspondence;

b.   evidence of software that would allow others to control the COMPUTER, such as
     viruses, Trojan horses, and other forms of malicious software, as well as evidence of
     the presence or absence of security software designed to detect malicious software;

c.   evidence of the lack of such malicious software;

    d.   evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

    e.   evidence indicating the computer user's state of mind as it relates to the crime under investigation;

    f.   evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

    g.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

    h.   evidence of the times the COMPUTER was used;

    i.   passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

    j.   documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

    k.   records of or information about Internet Protocol addresses used by the COMPUTER;

    l.   records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

    m.   contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media

that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, including "smart" phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

During the execution of the search of the SUBJECT VEHICLE described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) or obtain facial recognition of individuals found at the SUBJECT VEHICLE to the Touch ID sensor of cellular phones found at the SUBJECT VEHICLE for the purpose of attempting to unlock the device via Touch ID or facial recognition in order to search the contents as authorized by this warrant.

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

IN THE MATTER OF THE SEARCH OF:

A gray Saturn SUV bearing Virginia license
plate UYE4379, VIN: 3GSCL33P88S623549

Case No. 1:18-sw- 5 7٩



## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Zachary Mikkelson, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the premises known as 12905 Kerrydale

Road, Woodbridge, Virginia 22193 ("PREMISES 1"), 604 N Columbus Street, Alexandria,

Virginia 22314 ("PREMISES 2"), 3629 Sherbrooke Circle, Woodbridge, Virginia 22192

("PREMISES 3"), and 31 Stanley Loop, Fredericksburg, Virginia 22406 ("PREMISES 4"),

hereinafter "the PREMISES," further described in Attachment A, for the things described in

Attachment B.

2.    I also submit this affidavit in support of an application under Rule 41 of the

Federal Rules of Criminal Procedure for a warrant to search the following vehicles should these

vehicles be parked on the street or in the vicinity of the PREMISES, when the search warrant is

executed (1) a white cargo van bearing Virginia license plate TX48383, VIN:

1GCHG35K381198198 (later referred to in this affidavit as SUBJECT VEHICLE 1); (2) a white

Chevrolet cargo van bearing Virginia License plate VXR7144[1], VIN: 1FTPS24261HA19123 (later referred to in this affidavit as SUBJECT VEHICLE 2); (3) a gray Saturn SUV bearing Virginia license plate UYE4379, VIN: 3GSCL33P88S623549 (later referred to in this affidavit as SUBJECT VEHICLE 3); (4) a white Chrysler minivan bearing Virginia license plate VKT8006, VIN: 2C4RC1BG9CR400308 (later referred to in this affidavit as SUBJECT VEHICLE 4); (5) a white Land Rover SUV bearing VA license plate VJV3493, VIN: SALSH23447A113684 (later referred to in this affidavit as SUBJECT VEHICLE 5); (6) a black Mercedes sedan bearing VA license plate VVD3596, VIN: WDDNG71X77A047784 (later referred to in this affidavit as SUBJECT VEHILE 6); and (7) a gray Cadillac sedan bearing VA license plate VYL4203, VIN: 1G6DT57V080180392 (later referred to in this affidavit as SUBJECT VEHICLE 7).

      3.     As further explained herein, RASHOURN NILES, MAURICE JOHNSON, and BRYAN FERRELL have conspired to distribute controlled substances, specifically cocaine and heroin, within the Eastern District of Virginia and elsewhere.

      4.     I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) since July of 2015. I am currently assigned to the ATF Washington Field Division, Falls Church II Office. As a Special Agent with ATF, I am authorized pursuant to Title 18 U.S.C., Section 3051 to execute search warrants and enforce any of the criminal, seizure, or forfeiture provisions of the laws of the United States. Additionally, I am an "investigative or law enforcement officer of the United States" within the meaning of Section

---

[1] The physical license plate on the cargo van is VXR7144; however, DMV return for the Vehicle Identification Number (VIN) shows the license plate to be VXR7411 and registered to FERRELL. This is believed to be a data entry error by DMV

2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18.

5.      I have successfully completed numerous training programs hosted by ATF, the Federal Law Enforcement Training Center, and other federal law enforcement agencies and organizations. I have received specialized training in the investigation of federal crimes involving the trafficking of firearms and controlled substances. Prior to becoming a Special Agent with ATF, your affiant was a sworn police officer with the County of Henrico in the Commonwealth of Virginia since July of 2009.

6.      During that time, I participated in numerous drug and firearm investigations that resulted in the arrest and conviction of numerous subjects, the seizure of property and assets, and the seizure of controlled substances and firearms. During my time as a law enforcement officer, I have become knowledgeable of the methods and modes of narcotics operations, and the language and patterns of drug abuse and trafficking. I have gained knowledge in the use of various investigative techniques including the use of wiretaps, physical surveillance, undercover agents, confidential informants and cooperating witnesses, the controlled purchases of illegal narcotics, electronic surveillance, consensually monitored recordings, investigative interviews, financial investigations, the service of Grand Jury Subpoenas, and the execution of search and arrest warrants.

7.      Based on my training and experience, I know that individuals involved in criminal activities will often communicate with their associates before, during, or after the crime by using cellular telephones and that communication can be made through either verbal conversation, third party communication applications, or through the use of text messages between the two

3

communicating party's cellular telephones or other devices. It is also commonly understood and known that many people in our society communicate with their cellular telephones and other devices in both manners.

8.     Based on my training and experience, I also know that information gained through the obtaining of data stored in the part of the cellular telephone and other devices routinely referred to as an address book or contacts file in an individual's cellular telephone and other devices, as well as the recovery of text messages sent or received from that cellular telephone and other devices can lead to identifying accomplices, or witnesses to the crimes committed by the individual. Based on my training experience, I also know that know that individuals frequently maintain personal records and documents in an electronic format on laptop computers and/or smart phones.

9.     Based on my training and experience, I also know that distributors of controlled substances will utilize vehicles to move, store and conceal their controlled substances from law enforcement and the theft of others. These vehicles may have "traps" or other concealment methods within the vehicle or attached to the vehicle. I also know that distributers will often hide contraband and other evidence in vehicles with a desire to avoid law enforcement discovering the items if a search warrant is executed at their residence.

10.     Further, based on my training and experience in executing court-authorized search warrants, I also know that drug traffickers commonly maintain at their residences and on their property additional quantities of the illicit drugs being distributed. These drugs may be concealed in locations known to the traffickers to avoid law enforcement detection. Drug traffickers also commonly maintain at their residences and on their property paraphernalia for packaging, processing, diluting, weighing and distributing controlled substances.

4

11.     Based on my training and experience in executing court-authorized search warrants, I also know that drug traffickers commonly maintain at their residences money ledgers and other documents, which note the price, quantity, date and/or times when controlled substances were purchased, possessed, transferred, distributed, sold or concealed, or when money was possessed or transferred.

12.     The facts and information contained in this affidavit are based upon my personal knowledge of the investigation and observations of other law enforcement officers involved in this investigation. All observations not personally made by me were relayed to me by the individuals who made them or are based on my review of reports, documents, and other physical evidence obtained during the course of this investigation.

13.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### Background on the Investigation

14.     In March of 2017, law enforcement began an investigation into a group of individuals suspected of distributing cocaine and other drugs in the northern Virginia area. Through the course of this investigation, which is ongoing, law enforcement identified a group of three partners who operate a distribution network for cocaine, oxycodone, and heroin in Virginia, as well as the source of supply in California. The three partners operating in Northern Virginia are Rashourn NILES, Bryan FERRELL, and Maurice JOHNSON. NILES, FERRELL, and JOHNSON received multiple kilogram quantities of cocaine, diluted it, and repackaged it for sale into smaller quantities of cocaine. Kathleen FINUCAN assisted these partners by delivering cocaine and providing an apartment where bulk cocaine shipments were sometimes broken down into smaller quantities. NILES was arrested on December 6, 2017 and has plead guilty to federal

5

drug trafficking charges. The members of this group also acted jointly by combining drug proceeds into bulk cash shipments when sending payment for cocaine. NILES, FERRELL, and JOHNSON also shared the same source of supply, Co-Conspirator 1, and granted each other access to their own drug inventory at wholesale cost to fulfill customer orders in a timely manner.

15.     Rashourn NILES is a six time convicted felon including two previous convictions on federal drug trafficking offenses stemming from conduct in the Northern Virginia area. NILES has plead guilty to federal drug trafficking charges for his involvement in this conspiracy.

16.     Bryan FERRELL has a previous federal conviction for conspiracy to distribute crack cocaine in the Northern Virginia area.

17.     Maurice JOHNSON is a two time convicted felon for malicious wounding and possession with intent to distribute cocaine.

18.     Kathleen FINUCAN has no prior drug distribution convictions, but she is a target of an ongoing investigation by Fairfax County Police Department for distribution of cocaine base.

19.     Co-Conspirator 1 is a convicted felon with previous convictions for conspiracy, drug trafficking, and money laundering from across the United States. Co-Conspirator 1 was previously arrested by the Drug Enforcement Administration (DEA) in Arizona for distribution of marijuana and money laundering. A photograph of Co-Conspirator 1 obtained from the DEA's Phoenix Field Division was shown to a cooperating defendant, who confirmed that Co-Conspirator 1 is the source of supply for cocaine utilized by NILES, FERRELL, JOHNSON, and FINUCAN. The cooperating defendant also identified several monikers used to refer to Co-

6

Conspirator 1 and identified several phone numbers that were used to communicate with Co-Conspirator 1.

## PROBABLE CAUSE

14.     I adopt as part of this affidavit in support of an application under Rule 41 for a warrant to search the PREMISES and seize evidence, the attached affidavit in support of a criminal complaint and arrest warrant for JOHNSON and FERRELL (Attachment C). Consistent with the historical information above, law enforcement obtained evidence establishing that NILES, JOHNSON, and FERREL distribute multiple kilogram quantities of cocaine on a monthly basis in the northern Virginia area.

15.     During the course of this investigation, over one kilogram of cocaine base, 913 grams of cocaine hydrochloride, and 597 grams of heroin was purchased or recovered from individuals known to be supplied by this organization between March of 2017 and December of 2017. All controlled purchases of evidence were conducted by confidential informants at law enforcement direction. During every controlled purchase of evidence the confidential informants, along with their vehicles, were searched before and after for unauthorized items and no unauthorized items were found during any search. Each purchase was recorded and monitored by law enforcement units both electronically and through physical surveillance. All recordings were transferred to digital storage devices and entered into evidence.

16.     Through the review of information gained from a court authorized location tracking device, law enforcement learned that NILES frequently visited a single family home located at 12905 Kerrydale Drive, Woodbridge, Virginia. Through further investigation law enforcement was able to determine this residence was occupied by Maurice JOHNSON and his wife. Law enforcement was also able to identify JOHNSON's cell phone number and obtain call

7

records pursuant to a court order. Analysis of incoming and outgoing calls on JOHNSON's number show that from January 1, 2017 until December 6, 2017 JOHNSON and NILES called each other 2,620 times. The same analysis shows that JOHNSON and FERRELL exchanged at least 992 phone calls between January 1 and December 6 of 2017.

17.     Analysis of communication records obtained by law enforcement for known telephone numbers utilized by NILES and FERRELL show that between January 1, 2017 and December 6, 2017, these parties exchanged 712 phone calls through their cellular phones.

## INFORMATION ON THE INVOVLED PREMISES

18.     During the course of this investigation, law enforcement obtained a search warrant authorizing the disclosure of location based services for JOHNSON's known cellular phone. Based on an analysis of the accurate precision locations, JOHNSON's known cellular phone frequented PREMISES 3 and PREMISES 4. It also revealed that JOHNSON went to PREMISES 1 on one occasion outside of when he was observed there by law enforcement. Precise location data also showed JOHNSON not only in the area of PREMISES 2, but more specifically in the alley behind PREMISES 2, where FERREL is known to park his vehicles.

### A.     PREMISES 1 – 12905 KERRYDALE ROAD, WOODBRIDGE, VIRGINIA

19.     This property is owned by JOHNSON and his wife. The investigation revealed that prior to December 6, 2017, JOHNSON and his wife and children utilized this address as their main residence. NILES and FERRELL were also observed by law enforcement meeting with JOHNSON at this location prior to December 6, 2017. NILES was also observed using a key to enter this residence on multiple occasions.

20.     On December 6, 2017, a federal search warrant was executed at PREMISES 1. JOHNSON was present at the location when the search warrant was executed. Law enforcement

8

located and seized four firearms, ammunition, and six cellular phones from the inside of the residence during the execution of the search warrant. A consent search was also conducted on a vehicle parked in front of the residence at the time that the search warrant was executed. This vehicle was registered to JOHNSON and law enforcement seized $20, 600 from the center console.

21.     On August 3, 2018, JOHNSON travelled to Atlanta, George in a rental vehicle. On August 10, 2018, JOHNSON returned and met with FERRELL at a gas station prior to returning to a residence. JOHNSON was observed placing items from the rental vehicle into SUBJECT VEHICLE 4, which was being operated by FERRELL. JOHNSON then entered SUBJECT VEHICLE 4 with FERRELL and they travelled to PREMISES 1. FERRELL was observed entering PREMISES 1 with a backpack. Approximately one hour later, FERRELL and JOHNSON were observed exiting PREMISES 1 and returning to SUBJECT VEHICLE 4. FERRELL was carrying the same backpack that he entered the residence with and JOHNSON was carrying a large white bag. Precise location information obtained pursuant to a search warrant showed that JOHNSON also visited PREMISES 1 on July 24, 2018 and stayed only a few hours.

B.      **PREMISES 2 – 604 N COLUMBUS STREET, ALEXANDRIA, VIRGINIA**

22.     Premises 2 is the primary residence of FERRELL. The residence is address provided to the Virginia Department of Motor Vehicles by FERRELL's mother, Diane Ferrell, who also resides at PREMISES 2. FERRELL's brother has also been observed using PREMISES 2. Law enforcement has identified at least three vehicles registered to FERRELL at the address of PREMISES 2.

23.     Throughout the investigation, law enforcement has observed FERRELL using this

9

address on a regular basis. At approximately 1:00 AM on August 11, 2018, FERRELL returned

to PREMISES 2 after meeting with JOHNSON in Woodbridge, Virginia as JOHNSON returned

from a trip to Atlanta, Georgia. FERRELL then travelled to PREMISES 1 with JOHNSON in

SUBJECT VEHICLE 4 and later dropped JOHNSON off in the area of PREMISES 3. When

FERRELL returned to PREMISES 2 on the morning of August 11, he pulled into the alley

behind PREMISES 2 and stopped SUBJECT VEHICLE 4 in the area where SUBJECT

VEHICLE 1 and SUBJECT VEHICLE 2 were parked. FERRELL then exited SUBJECT

VEHICLE 4 and appeared to be moving items between SUBJECT VEHICLE 4 and either

SUBJECT VEHICLE 1 or SUBJECT VEHICLE 2 or both. FERRELL then parked SUJBECT

VEHICLE 4 in front of PREMISES 2 and entered through the front door.

24.     Previously, on June 19, 2018, law enforcement observed FERRELL exiting

PREMISES 2. FERRELL moved multiple items from SUBJECT VEHICLE 1 to SUBJECT

VEHICLE 2 and also went to SUBJECT VEHICLE 3. FERRELL left the area in SUBJECT

VEHICLE 2 and travelled to PREMISES 4 where he met JOHNSON.

25.     Precis location information obtained pursuant to a search warrant also showed

JOHNSON's known cellular phone to be in the area of PREMISES 2, more specifically, in the

alley behind PREMISES 2, where FERRELL parks his vehicles.

C.     **PREMISES 3 – 3629 SHERBROOKE CIRCLE, WOODBRIDGE,**
**VIRGINIA**

26.     PREMISES 3 is the primary residence of Co-Conspirator 2. Co-Conspirator 2 has

almost daily phone contact with JOHNSON throughout the timeframe of this investigation. Text

messages between JOHNSON and Co-Conspirator 2 were located by law enforcement on

devices recovered from PREMISES 1 during the execution of the search warrant on December 6,

10

2017. These text messages reveal JOHNSON to have a romantic relationship with Co-Conspirator 2, as well as being involved in narcotics trafficking. As part of the conspiracy, JOHNSON sent numbers consistent with tracking numbers and directed Co-Conspirator 2 to retrieve packages for him.

27.     Additionally, JOHNSON spends a significant amount of time at PREMISES 3 and often stay overnight. Precise location information obtained pursuant to a search warrant shows that JOHNSON's known cellular phone is located at PREMISES 3 during overnight periods and is the most frequent location of his phone outside of his residence (PREMISES 4).

28.     Co-Conspirator 2 also travelled with JOHNSON to Atlanta, Georgia from August 3, 2018 to August 10, 2018. After JOHNSON met with FERRELL upon returning to the northern Virginia area, Co-Conspirator 2 drove JOHNSON's rental vehicle back to PREMISES 3 and entered the residence with a young child. AFTER JOHNSON and FERRELL left PREMISES 1 on August 10, JOHNSON was dropped off by FERRELL in the area of PREMISES 3. JOHNSON and Co-Conspirator 2 have also been observed by law enforcement entering and exiting PREMISES 3 on multiple occasions.

### D.     **PREMISES 4 – 31 STANLEY LOOP, FREDERICKSBURG, VIRGINIA**

29.     PREMISES 4 is owned by FERRELL, but following the search warrant at PREMISES 1 on December 6, 2017, JOHNSON and his wife and children currently use PREMISES 4 as their primary residence. FERRELL has owned PREMISES 4 since approximately June of 2017. Law enforcement has conducted surveillance at PREMISES 4 on more than twenty occasions and it was always appeared to be the primary residence of JOHNSON and his family following the events of December 6, 2017.

30.     Specifically, on June 19, law enforcement observed FERRELL leave PREMISES

11

2 and travel to PREMISES 4 in SUBJECT VEHICLE 2. FERRELL and JOHNSON then left PREMISES 4 together in SUBJECT VEHICLE 2. FERRELL and JOHNSON then made two short duration stops before separating. JOHNSON was observed returning alone to PREMISES 4 operating SUBJECT VEHICLE 5.

31.     During the time that JOHNSON was in Atlanta, Georgia between August 3 and August 10, 2018, SUBJECT VEHICLE 3 was observed parked at PREMISES 4. After JOHNSON returned from Atlanta, Georgia, SUBJECT VEHICLE 3 returned to the area PREMISES 2. SUBJECT VEHICLE 3 is registered to FERRELL.

32.     Precise location information obtained pursuant to a search warrant show that PREMISES 4 is the most frequented location of JOHNSON, followed closely by PREMISES 3.

E.     **ADDITIONAL VEHICLES**

33.     SUBJECT VEHICLE 5, SUBJECT VEHICLE 6, and SUBJECT VEHICLE 7 are all vehicles utilized by JOHNSON. SUBJECT VEHICLE 5 is registered to JOHNSON and has been consistently used by JOHNSON throughout this investigation. SUBJECT VEHICLE 6 has been consistently parked at PREMISES 4 following December 6, 2017. Prior to that, the vehicle was observed consistently parked at PREMISES 1. JOHNSON has been observed using SUBJECT VEHICLE 6 on multiple occasions. SUBJECT VEHICLE 7 was also observed consistently at PREMISES 1 prior to the events of December 6, 2017. SUBJECT VEHICLE 7 was then observed consistently at PREMISES 4 once JOHNSON took up residence there. SUBJECT VEHICLE 7 has been primarily driven by the wife of JOHNSON, but JOHNSON has been observed utilizing it on multiple occasions. SUBJECT VEHICLE 5, SUBJECT VEHICLE 6, and SUBJECT VEHICLE 7 are constantly parked in different locations around PREMISES 4 including the garage, the driveway, and the street in front of the residence.

12

34. Based on my training and experience, I know it is common for drug traffickers to maintain controlled substances, illicit contraband, and proceeds from their illegal activities at multiple residences to prevent law enforcement and/or robbers from seizing the contraband. Similarly, it is common for drug traffickers to store contraband and proceeds in vehicles in order to prevent the discovery of those items by law enforcement if a search warrant is executed at their residence. Drug traffickers also consistently use vehicles to conceal, transport, and conduct sales of controlled substances, and conceal and transport the proceeds of those sales.

## USE OF CELLULAR TELEPHONES/STORAGE MEDIA BY DRUG TRAFFICKERS

35. Based on my training, experience, and participation in narcotic and drug-related investigations, and my knowledge of this case, I know that:

     a. It is common for individuals engaged in the distribution of controlled substances to use telephonic communications, both cellular (to include voice and text messages) and hard line, to further their criminal activities by coordinating the distribution of narcotics, illegal proceeds of narcotics trafficking, and other efforts of co-conspirators;

     b. Individuals engaging in the distribution of controlled substances use cellular telephones and cellular telephone technology to communicate and remain in constant contact with customers and the sources of those controlled substances;

     c. Individuals who engage in the distribution of controlled substances use cellular telephones to exchange information with customers and/or source(s) of supply through text messaging and instant messaging in addition to direct telephone conversations. It is also common for narcotics traffickers to send photographs and videos as exchange of information with customers and/or source(s) of supply;

13

and

d. Individuals who engage in the distribution of controlled substances frequently maintain information, personal records, photographs, and documents in an electronic format on computers and/or smart phones.

36. In my training and experience, it is likely that the PREMISES will contain at least one cellular phone because of the use of cellular phones in furtherance of the conspiracy to distribute controlled substances described above.

37. Further, I know that VANDIVER, NILES, and MCALLISTER have used cellular phones to communicate about drug transactions. Moreover, during the course of this investigation, law enforcement have seized numerous cellular phones. After obtaining search warrants, law enforcement have located conversations, videos, and photographs documenting a conspiracy to distribute controlled substances.

38. I know from my training and experience, as well as from information found in publicly available materials including those published by cellular phone providers, that some makes and models of cellular phones offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID.

39. If a user enables Touch ID on a given cellular phone device, he or she can register fingerprints that can be used to unlock that device. The user can then use any the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor. In my training and experience, users of cellular phone devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to

14

protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

40.     In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead. These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked cellular phone device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch ID are made.

41.     The passcode or password that would unlock the cellular phone is not known to law enforcement. Thus, it will likely be necessary to press the finger(s) of the user(s) of the cellular phone to the device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant cellular phone device(s) via Touch ID with the use of the fingerprints of the user(s) is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

42.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device via Touch ID, and it is

15

also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any occupant of the PREMISES to press their finger(s) against the Touch ID sensor of the locked cellular phone device(s) found during the search of the Subject Premises in order to attempt to identify the device's user(s) and unlock the device(s) via Touch ID.

43.     Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience, I know that it is common for a user to unlock a Touch ID-enabled cellular phone device via the fingerprints on thumbs or index fingers. In the event that law enforcement is unable to unlock the cellular phone as described above within the attempts permitted by Touch ID, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

44.     Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at the PREMISES to the Touch ID sensor of cellular phones for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

45.     After any cellular phones are seized, ATF or FBI will begin the search of the phones within the Eastern District of Virginia. If ATF or FBI cannot complete the search then agents will send the phones to a private company that specializes in data extraction from Apple iPhones and other electronics. This private company will either (a) unlock the phone(s) and then return the phone(s) to the ATF or FBI office located in the Eastern District of Virginia, where the

16

actual analysis of the contents of the phone(s) will take place or (b) unlock the phone(s) and

create a forensic image of the phone(s), and then return the phone(s) to the ATF or FBI office

located in the Eastern District of Virginia, where the actual analysis of the contents of the

phone(s) will take place.

## TECHNICAL TERMS

46.    Based on my training and experience, I use the following technical terms to

convey the following meanings:

a. *IP Address*: The Internet Protocol address (or simply "IP address") is a

unique numeric address used by computers on the Internet. An IP address

looks like a series of four numbers, each in the range 0-255, separated by

periods (e.g., 121.56.97.178). Every computer attached to the Internet must

be assigned an IP address so that Internet traffic sent from and directed to that

computer may be directed properly from its source to its destination. Most

Internet service providers control a range of IP addresses. Some computers

have static—that is, long-term—IP addresses, while other computers have

dynamic—that is, frequently changed—IP addresses.

b. *Internet*: The Internet is a global network of computers and other electronic

devices that communicate with each other. Due to the structure of the

Internet, connections between devices on the Internet often cross state and

international borders, even when the devices communicating with each other

are in the same state.

c. *Storage medium*: A storage medium is any physical object upon which

computer data can be recorded. Examples include hard disks, RAM, floppy

17

disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

47.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

48.     *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In

18

addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

49.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage

19

medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity

20

can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to

21

destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

50.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make

22

an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

23

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

51. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

52. *Because* several people share the PREMISES as a residence and use the SUBJECT VEHICLES, it is possible that the PREMISES and/or SUBJECT VEHICLES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

53. Based on the foregoing facts, there is probable cause to believe that MAURICE JOHNSON and BRYAN FERRELL have conspired to distribute and possess with intent to distribute cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and 846. In addition, there is probable cause to believe that items and records that are evidence of these violations are currently contained in the PREMISES and/or SUBJECT VEHICLES. I submit that this affidavit therefore supports probable cause for a warrant to search the PREMISES

24

and/or SUBJECT VEHICLE described in Attachment A and seize the items described in

Attachment B.

Respectfully submitted,

Zachary D. Mikkelson
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to before me on September 19, 2018.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

The Honorable Theresa Carroll Buchanan
United States Magistrate Judge

25

## ATTACHMENT A

*Property to be searched*

The property to be searched is a gray Saturn SUV bearing Virginia license plate UYE4379, VIN: 3GSCL33P88S623549.

## ATTACHMENT B

### *Items to be Seized*

The items to be seized are fruits, evidence, records and information relating to, contraband, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846(a) (distribution and possession with intent to distribute cocaine and other controlled substances, and conspiracy to distribute cocaine and other controlled substances) including, but not limited to:

a. Controlled substances, packaging materials, indicia of distribution, records and documents, receipts, notes ledgers and other papers including any computerized or electronic records including cellular telephones, relating to the ordering, purchase or possession of controlled substances;

b. U.S. currency and other illicit gains from the distribution of controlled substances;

c. Address and/or telephone books and papers, including computerized or electronic address and/or telephone records reflecting names, addresses and/or telephone numbers;

d. Books, records, receipts, bank statements, and records, money drafts, and any other items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money or other assets including, but not limited to, controlled substances;

e. Documents and papers evidencing ownership of proceeds from the sale of controlled substances, storage and location of such assets and facilities to safely store and secure such items, such as safes, to include lock boxes, and strong boxes;

f.  Photographs, in particular, photographs of controlled substances and photographs of individuals possessing controlled substances and photographs showing the association of individuals;

g.  Indicia of occupancy, residence, and/or ownership of the premises described herein, including, but not limited to, utility and telephone bills, cancelled envelopes, and keys;

h.  Cellular phones, computers, and other electronic storage media or digital devices;

i.  For any electronics searched, any conversations, whether through text messages or other applications, where FINUCAN, FERRELL, and/or JOHNSON discusses the purchase and sale of cocaine and other controlled substances;

j.  For any electronics searched, any photographs of controlled substances.

For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media

that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, including "smart" phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

During the execution of the search of the SUBJECT VEHICLE described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) or obtain facial recognition of individuals found at the SUBJECT VEHICLE to the Touch ID sensor of cellular phones found at the SUBJECT VEHICLE for the purpose of attempting to unlock the device via Touch ID or facial recognition in order to search the contents as authorized by this warrant.

# ATTACHMENT C

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | |
| Bryan FERRELL <br> a/k/a "BJ" <br> a/k/a "BJ Homie" | **UNDER SEAL** |
| | Case No. 1:18-mj- |
| Maurice JOHNSON <br> a/k/a "MOOK" | The Hon. Theresa Carroll Buchanan |
| and | |
| Kathleen FINUCAN | |
| Defendants. | |

## AFFIDAVIT IN SUPPORT OF A
## CRIMINAL COMPLAINT AND ARREST WARRANTS

I, Zachary Mikkelson, being duly sworn, do hereby depose and state as follows:

### Introduction and Agent Background

1.     I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and

Explosives (ATF) since July of 2015.  I am currently assigned to the ATF Washington Field

Division, Falls Church II Office.  As a Special Agent with ATF, I am authorized pursuant to Title

18 U.S.C., Section 3051 to execute search warrants and enforce any of the criminal, seizure, or

forfeiture provisions of the laws of the United States.  Additionally, I am an "investigative or law

enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United

States Code, that is, an officer of the United States who is empowered by law to conduct

investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18.

2.      I have successfully completed numerous training programs hosted by ATF, the Federal Law Enforcement Training Center, and other federal law enforcement agencies and organizations. I have received specialized training in the investigation of federal crimes involving the trafficking of firearms and controlled substances. Prior to becoming a Special Agent with ATF, your affiant was a sworn police officer with the County of Henrico in the Commonwealth of Virginia since July of 2009. During that time, I participated in numerous drug and firearm investigations that resulted in the arrest and conviction of numerous subjects, the seizure of property and assets, and the seizure of controlled substances and firearms.

3.      During the course of my career, I have participated in the investigation of narcotics traffickers and possessors. Many of these investigations led to the arrest and conviction of narcotics dealers. In the course of conducting these investigations, I have used several different kinds of investigative techniques, including: interviewing informants and cooperating sources; conducting physical surveillance; conducting short-term and long-term undercover operations, including reverse undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification data; conducting court-authorized electronic surveillance; preparing and executing search warrants, which have led to substantial seizures of narcotics, firearms, contraband, and drug related assets; and, the analysis of financial documents and records.

4.      I submit this affidavit in support of a criminal complaint and arrest warrant for BRYAN FERRELL (a/k/a "BJ," a/k/a "BJ HOMIE"), MAURICE JOHNSON (a/k/a "Mook"), and KATHLEEN FINUCAN for unlawfully, knowingly, and intentionally combining, conspiring, confederating and agreeing with others, both known and unknown, to unlawfully,

2

knowingly and intentionally distribute and possess with the intent to distribute five kilograms or more of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

5.      This affidavit contains information necessary to support probable cause. The information contained in this affidavit is not intended to include each and every fact and matter observed by me or known to the government. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

6.      During the course of this investigation, law enforcement has debriefed and used multiple cooperating sources. Regardless of the cooperating sources' gender, they will be referred to in the masculine gender. The cooperating sources have been corroborated by cell phone evidence and other information proven to be reliable and credible.

## **Background of the Investigation**

7.      In March of 2017, law enforcement began an investigation into a group of individuals suspected of distributing cocaine and other drugs in the northern Virginia area. Through the course of this investigation, which is ongoing, law enforcement identified a group of three partners who operate a distribution network for cocaine, oxycodone, and heroin in Virginia, a co-conspirator who assisted them in their Northern Virginia distribution, and their source of supply in California. The three partners operating in Northern Virginia are Rashourn NILES, Bryan FERRELL, and Maurice JOHNSON. NILES, FERRELL, and JOHNSON received multiple kilogram quantities of cocaine, diluted it, and repackaged it for sale into smaller quantities of cocaine. The three partners also conspired with Kathleen FINUCAN, who assisted

3

the partners by delivering cocaine and providing an apartment where bulk cocaine shipments were sometimes broken down into smaller quantities. The three partners combined drug proceeds into bulk cash shipments when sending payment for cocaine to their shared source of supply, Co-Conspirator 1. They granted each other access to their own drug inventory to fulfill customer orders in a timely manner. NILES was arrested on December 6, 2017 and has plead guilty to federal drug trafficking charges.

8.      Rashourn NILES is a six-time convicted felon including two previous convictions for federal drug trafficking offenses stemming from conduct in the Northern Virginia area. NILES has plead guilty to federal drug trafficking charges for his involvement in this conspiracy.

9.      Bryan FERRELL has a previous federal conviction for conspiracy to distribute crack cocaine in the Northern Virginia area.

10.     Maurice JOHNSON is a two-time convicted felon for malicious wounding and possession with intent to distribute cocaine.

11.     Kathleen FINUCAN has no prior drug distribution convictions, but she is a target of an ongoing investigation by Fairfax County Police Department for distribution of cocaine base.

12.     Co-Conspirator 1 is has previous convictions for conspiracy to traffic drugs, drug trafficking, and money laundering. Law enforcement showed a photograph of Co-Conspirator 1 to a cooperating defendant, and the cooperating defendant confirmed that Co-Conspirator 1 is the source of supply for cocaine utilized by NILES, FERRELL, and JOHNSON. The cooperating defendant also identified several monikers used to refer to Co-Conspirator 1 and identified several phone numbers that were used to communicate with Co-Conspirator 1.

4

## Information from Cooperating Defendant 1

13.     On July 5, 2017, members of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), the Federal Bureau of Investigation (FBI), and the Prince William County Police Department (PWCPD) arrested an individual referred to hereafter as Cooperating Defendant 1 or CD-1, at a location within the Eastern District of Virginia. Prior to this date, an undercover law enforcement officer had purchased approximately 119 grams of heroin and three firearms from CD-1 in seven previous transactions. At the time of his arrest, CD-1 was in possession of 55 grams of heroin and a firearm. All of the substances purchased from CD-1 were submitted to the DEA Laboratory for testing and were confirmed to be either heroin or fentanyl.

14.     In an interview that took place shortly after his arrest, CD-1 agreed to waive his *Miranda* rights and speak to law enforcement. CD-1 also signed a consent to search form granting law enforcement permission to search and download the data stored on his phone. CD-1 spoke to law enforcement in the hopes of receiving a lesser sentence for his charges, but his information has been independently corroborated by cell phone evidence and other individuals, and he has been deemed reliable.

15.     CD-1 stated that his supply for cocaine and firearms, whom he knew as "BJ HOMIE," had supplied him with significant quantities of cocaine and was able to supply cocaine at the kilogram level. CD-1 estimated that he had purchased an average of four to five ounces of cocaine from BJ HOMIE every week and a half since early 2017. CD-1 stated that he had arranged to purchase 15 ounces of cocaine from him on his next purchase. CD-1 stated he obtained his cocaine on consignment and afterwards paid $1,000 per ounce. CD-1 was shown a photograph of FERRELL and CD-1 confirmed that it was the individual he was referring to as "BJ HOMIE."

16.     CD-1 stated that on previous occasions, he had met FERRELL at his mother's house in Alexandria, Virginia. This is corroborated by information recovered from CD-1's cell phone. On May 25, 2017, CD-1 received a series of text messages from FERRELL reading "200 Hillwood Ave, Falls Church, VA 22046." Law enforcement knows this address to be that of FERRELL's employer. Later that day, FERRELL messaged CD-1 "604 North Columbus Street, Alexandria, VA 22314." Law enforcement knows this address to be that of FERRELL's mother. Law enforcement has observed FERRELL entering this house on numerous occasions, and has observed FERRELL's vehicles parked outside that location for extended periods of time.

17.     On June 7, 2017, CD-1 sent the following message to FERRELL "Bro tell me something, I got niggas hittin my line like crazy. The shit u was telling me that u was gone give me is basically gone already. Ima need more than what u was gone give me. And I don't know what to tell D bro, he talkin about shopping somewhere else because he losing clientele right now bro. I need u to fill me in bro." On June 8, 2017, CD-1 received a text message from a number known by law enforcement to be used by FERRELL. The content of the message was the address "807 Pendleton Street, Alexandria, VA 22314." This is the address of a retail store approximately 25 yards from FERRELL's residence at 604 North Columbus Street, Alexandria, Virginia.

18.     On June 11, 2017, CD-1 sent the following message to FERRELL. "What's up bro, why u ain't never hit me yesterday. I understand u be busy bro, but u need to let me know that. I be waitin around for u all day bro, I was in Woodbridge all day yesterday waiting for u bro. That shit be blowin me bro, I be missin out on business and everything. And I be having your money longer than I need it, bro I like to get the shit sold. Reup and do it again, I can't call myself a real hustler if I'm not consistent bro."

6

19.     A review of data stored on CD-1's phone shows that on May 11, 2017, CD-1 and

FERRELL exchanged a series of text messages reading "My brother is going to be ready to pay

you tomorrow, did Buzz let you know whats up?", "U got any $100 bills, I'm trying to get off all

these 20's bro. I got way too many," FERRELL responded "Me too bro," "I'll check with my

man." CD-1 then messaged FERRELL "He got 1090 right now, if u want me to drop that off

with u I can do that." "or if you want to wait until he has everything I can do that too."

20.     The number that CD-1 was using to contact FERRELL was saved in CD-1's

contacts as "BJ HOMIE."

### Information Provided by Cooperating Defendant 2

21.     Coopering Defendant 2 was arrested on December 6, 2017 for drug conspiracy

charges and has plead guilty. He is cooperating with law enforcement because he hopes to

receive a sentence reduction. His statements have been corroborated by phone evidence and by

information from other individuals, and he has been deemed reliable.

22.     On May 1, 2018, CD-2 participated in an interview with law enforcement. During

the interview, CD-2 revealed that Bryan FERRELL, aka "BJ," aka "B BRO," and Maurice

JOHNSON, aka "MOOK," distribute multiple kilogram quantities of cocaine on a monthly basis,

utilizing Co-Conspirator 1 as their source of supply, and have done so since at least early 2015.

CD-2 stated that FERRELL, JOHNSON, and NILES shared cocaine amongst each other for the

purpose of filling orders and comingled their cash when sending payments to the Co-Conspirator

1. CD-2 stated that FERRELL and JOHNSON operate in close coordination, distributing at least

5 kilograms of cocaine per month between them, in addition to the 5 kilograms per month that

CD-2 estimated his own sales to be.

7

23.     CD-2 explained that in early 2015, he was introduced to Co-Conspirator 1 through an associate of JOHNSON. CD-2 was shown a photograph of Co-Conspirator 1 and confirmed his identity.  CD-2 identified phone numbers within his own phone that he used to communicate with Co-Conspirator 1 regarding drug trafficking.

24.     According to CD-2, NILES, FERRELL, JOHNSON started out jointly purchasing large quantities of marijuana before moving on to cocaine to achieve higher profit levels. CD-2 stated that when he first started selling cocaine, he purchased approximately 3-5 kilograms of cocaine in early 2015, before breaking contact with Co-Conspirator 1 for approximately 5 months. Around the summer of 2015, CD-2 reinitiated contact and resumed purchasing cocaine from him, working up to the rate of 5 kilograms per month. CD-2 stated that Co-Conspirator 1 required his customers to order 5 kilograms per month and that FERRELL and JOHNSON also maintained this level of purchasing and distribution.

25.     CD-2 stated that the cost for a kilogram of cocaine was $25,000 if paid for up front, and $32,000 if purchased on consignment. CD-2 stated that his average profit was approximately $15,000 per kilogram. CD-2 stated that he would receive packages in the mail containing individual kilograms concealed within a cut out portion of a large book. CD-2 explained that regardless of the quantity of kilograms he ordered, they would arrive one at a time, individually packaged, through the United States Postal Service.

26.     CD-2 stated NILES  provided his cash to FERRELL and JOHNSON.  The three would then combine the cash and mail it back to Los Angeles, where Co-Conspirator 1 was located. CD-2 describes the business relationship of JOHNSON and FERRELL to be structured in a way that JOHNSON provided cash to invest in the business but tried to "keep his hands clean" and stay out of the overt drug activity.  FERRELL, on the other hand, serves as the

8

primary point of contact with Co-Conspirator 1, arranging outgoing shipments of cash and incoming shipments of product, in addition to conducting most of the distribution work.

27. CD-2 stated that FINUCAN routinely delivered drugs on behalf of NILES. CD-2 stated that he knew FINUCAN utilized a Honda Civic that FINUCAN owned when making these deliveries. CD-2 also stated that FINUCAN was present at 2750 Green Ash Loop Apartment #404 on several occasions when NILES, FERRELL, and JOHNSON were present for the purpose of breaking down and diluting multiple kilogram quantities of cocaine for resale. CD-2 stated that the garage of FINUCAN's apartment was used to store multiple kilogram quantities of cocaine. CD-2 stated that during these instances, FERRELL would be the person who arrived with the uncut cocaine, usually driving a white Dodge Charger or a white minivan.[1]

28. CD-2 stated that during the past year, FINUCAN flew to Los Angeles with $40,000 in U.S. currency to provide to NILES so that NILES could purchase 4 kilograms of cocaine from Co-Conspirator 1.

29. CD-2 also stated that FINUCAN had her own customer base to whom she sold cocaine. CD-2 stated that FINUCAN purchased an ounce of cocaine approximately 1-2 times a week from NILES for $1,100 per ounce. Additionally, CD-2 stated that on one occasion, FINUCAN purchased 500 doses of 30mg Oxycodone tablets from NILES, which FINUCAN sold. CD-2 stated that these 500 came from a total shipment of 1,000 pills, which NILES purchased from Co-Conspirator 1 for a price of approximately $7-$10 per pill.

---

[1] FERRELL and his mother are co-registered owners of a white minivan (VA tag VKT8006). FERREL's brother is the registered owner of a white Dodge Charger

## Information Provided by Cooperating Defendant 3

30.     Coopering Defendant 3 (CD-3) was arrested on December 5, 2017 for drug conspiracy charges and has plead guilty. He is cooperating with law enforcement because he hopes to receive a sentence reduction. His statements have been corroborated by phone evidence and by information from other individuals, and he has been deemed reliable.

31.     On July 9, 2018, CD-3 was interviewed by law enforcement. Law enforcement knows through previous investigation that CD-3 has regularly purchased, and arranged third party purchases of, large amounts of cocaine and heroin from NILES for approximately nine months prior to NILES's arrest on December 6, 2017. CD-3 stated that when NILES was incarcerated for a period of 60 days for a violation of federal probation, CD-3 obtained one to two ounces of powder cocaine from JOHNSON on four separate occasions. CD-3 also stated that in approximately 2006, he sold a firearm to JOHNSON, who had two felony convictions at that time. CD-3 was shown an image of JOHNSON and confirmed his identity.  CD-3 stated that in 2016, NILES asked him to travel to California and deliver $30,000 to NILES's source of supply. CD-3 was shown a photograph of Co-Conspirator 1, and he positively identified him as the individual to whom he delivered $30,000.

## Information Provided by Cooperating Defendant 4

32.     Coopering Defendant 4 (CD-4) was arrested on August 15, 2018 for a firearms charge. He is cooperating with law enforcement because he hopes to receive consideration on his pending charges. His statements have not yet been corroborated.

33.     In June of 2018, law enforcement approached CD-4 prior to his arrest regarding his knowledge of NILES, JOHNSON, and FERRELL. CD-4 provided information that he had purchased drugs directly from NILES.  CD-4 stated that on one occasion a female, who was

10

either light skinned or "mixed," in her 30's, and drove a Honda, delivered drugs to him at Potomac Mills Mall. In a later interview after his arrest, CD-4 was shown a photograph of FINUCAN and stated it could have been the individual who delivered the drugs, but he was not sure.

34.     CD-4 stated that "Mook" was a partner of NILES. In the interview after his arrest, CD-4 identified a photograph of JOHNSON as "Mook." CD-4 stated that he previously knew JOHNSON from a time when he was incarcerated with both NILES and JOHNSON. CD-4 stated that he knew JOHNSON to distribute cocaine and marijuana. CD-4 stated that NILES had identified JOHNSON as his partner during a conversation with CD-4. CD-4 also stated that he had sold between three and five firearms to JOHNSON in 2017. CD-4 stated that on one of these occasions, NILES provided CD-4 with one pound of marijuana in exchange for the firearm being provided to JOHNSON. CD-4 stated that on a separate occasion, he owed NILES money for drugs he had been provided. CD-4 provided two firearms to JOHNSON, and NILES considered the debt paid. CD-4 stated that he would obtain 5-10 pounds of marijuana from NILES on a regular basis and also received approximately a half ounce and a whole ounce of cocaine from NILES on two separate occasions.

## NILES, FERRELL, JOHNSON and FINUCAN's Use of Residences

35.     On October 21 and 22, 2017, ATF conducted physical and electronic surveillance of JOHNSON's residence at 12905 Kerrydale Drive. On October 21, JOHNSON was observed entering his residence. The next day, NILES and FERRELL were observed approaching the front door of JOHNSON's residence. NILES used a key to unlock the front door and entered the residence. FERRELL remained outside the residence until he was met by JOHNSON, at which point both men walked a short distance and stopped at the corner of the house adjacent to the

driveway. NILES then exited the house for a short period of time before all three entered the residence. NILES again unlocked the front door with a key, demonstrating he had access to JOHNSON's residence.

36.     On October 25, 2017, law enforcement observed NILES and an unknown male enter JOHNSON's residence. When they exited the residence a short time later, the unknown male was carrying a back pack that he did not have when he arrived. Later that same day, JOHNSON was observed departing the area of 13715 Lynn Street, Woodbridge, Virginia with NILES departing the same area a short time after JOHNSON. 13715 Lynn Street, Woodbridge, Virginia was one of NILES's known stash houses.

37.     On October 30, 2017, CD-3 ordered a half kilogram of cocaine from NILES. NILES advised that he was not in the area, but that someone would be delivering the requested amount of cocaine. Approximately one and a half hours later, CD-3 was observed meeting with an Audi sedan in the parking lot outside of CD-3's residence.

38.     Law enforcement then surveilled that Audi sedan, as it travelled to 2750 Green Ash Loop, which was known to law enforcement to be the primary residence of FINUCAN. A male individual was observed entering 2750 Green Ash Loop with a white plastic bag. He then exited a short time later without the bag and departed in the Audi sedan. The cocaine was later recovered by law enforcement and submitted to the DEA Laboratory where it was confirmed to be 502.2 grams of cocaine.

### Search Warrant at 12905 Kerrydale Road on December 6, 2017

39.     On December 6, 2017, law enforcement executed a federal search warrant at JOHNSON's primary residence at the time, 12905 Kerrydale Road, Woodbridge, Virginia. JOHNSON was present at the location when the search warrant was executed. Law enforcement

located and seized four firearms, ammunition, and six cellular phones from the inside of the residence during the execution of the search warrant. At the time of the search warrant execution, a dark color Land Rover Range Rover bearing Virginia license plate VRX8474 was parked on the street in front of the residence. JOHNSON provided verbal consent for law enforcement to search the vehicle. Within the center console of a vehicle, law enforcement located $20,600 in U.S. currency. This vehicle is registered to JOHNSON with the Virginia Department of Motor Vehicles.

40. One of the cell phones located within the residence was an Alcatel 4060A bearing IMEI 014699006650454. In that phone, law enforcement observed two contact phone numbers with Los Angeles area codes that were stored under the names "Cal" and "Fam." These phone numbers and names would later be identified by Cooperating Defendant 2 (henceforth CD-2) as belonging to Co-Conspirator 1, who is the Source of Supply (SOS) for the conspiracy. These numbers hereafter will be referred to as SOS Telephone Number 1 (818-310-6903) and SOS Telephone Number 2 (323-338-9173). Communication records for SOS Telephone Number 2 show that JOHNSON, FERRELL, and CD-2 all called this number from August 2017 to October of 2017. Text message conversations between JOHNSON and the above two numbers contain discussions related to drug trafficking including payment for product. The SOS Telephone Numbers provided addresses in California to JOHNSON for shipment of payment and JOHNSON would provide addresses in the northern Virginia area for shipment of product. JOHNSON and the SOS Telephone Numbers also sent series of numbers consistent with tracking numbers.

41. An additional cell phone located within the residence was a Samsung Galaxy S4 bearing Android ID 351db02174559b82. This phone used a number law enforcement previously

13

identified as belonging to JOHNSON. Within the contact list of this device was an entry for a one of FERRELL's known phone number. Also located in this phone's contact list was SOS Telephone Number 2 under the name "Calf."

### Search Warrant executed at 13715 Lynn Street on December 6, 2017

42.     On December 6, 2017, law enforcement executed a federal search warrant at 13715 Lynn Street, Woodbridge, Virginia. Located within the residence was approximately 1,014 grams of heroin. The suspected heroin was submitted to the DEA laboratory for analysis and confirmed to be heroin. In addition to the heroin, law enforcement recovered a "big bastard" kilogram press, a smaller press, two digital scales, suspected cutting material, and a food saver sealer and food saver bags.

### Search & Arrest Warrant at 15144 Cloverdale Road on December 6, 2017

43.     On December 6, 2017, law enforcement executed a federal search warrant at 15144 Cloverdale Road, Woodbridge, Virginia and a federal arrest warrant for NILES. NILES was located within the residence. Also located within the residence were one firearm, assorted ammunition, nine cellular phones, $5,100 in U.S. currency, an electronic money counter, and legal paperwork in NILES's name. Law enforcement located an additional $7,480 in U.S. currency in one of NILES's vehicles parked outside of 15144 Cloverdale. One of the cell phones recovered from the residence was an Apple iPhone Model A1660 bearing IMEI 355827085152947. Further analysis of the information stored on this phone revealed that it had a phone number known by law enforcement to be used by NILES.

44.     Information stored within this phone showed that NILES used the phone to communicate with SOS Telephone Number 2, FERRELL, and JOHNSON. On November 29,

14

2017, NILES sent FERRELL a text message stating, "B fam said call him," "It's there." CD-2 identified "fam" is a moniker that was used to refer to Co-Conspirator 1.

45.     Two weeks prior to this conversation, NILES sent a video to FERRELL showing over $100,000 in U.S. currency being packaged into a shoebox. Images saved on the device also show nicknames and corresponding amounts ranging from 10,000 to 50,500. Based on my training and experience, these appear to be drug ledgers commonly referred to as pay/owe sheets. The device also contained images of drugs, jewelry, as well as luxury vehicles registered to JOHNSON.

### Search Warrant at 2750 Green Ash Loop, Apt# 404 on December 6, 2017

46.     On December 6, 2017, law enforcement executed a federal search warrant at 2750 Green Ash Loop, Apartment 404, the primary residence of FINUCAN and a location that NILES regularly visited. Within this location, law enforcement recovered one firearm, several hundred rounds of ammunition, 12 cellular phones, three digital scales, two 200mg calibrating weights, a food saver vacuum bag sealing device, packaging materials, 5.5 grams of cocaine, THC edibles, and approximately $20,000 in U.S. currency.

47.     Within garages that were leased along with the apartment were two luxury automobiles. One of these vehicles was a 2011 Jaguar XJ, registered to JOHNSON. Interviews of other known individuals revealed that this vehicle was used almost exclusively by NILES. CD-2 later provided information that NILES directed JOHNSON to register the Jaguar XJ in JOHNSON's name because JOHNSON had a job at the time.

48.     An Apple laptop that was recovered and forensically analyzed showed that the user visited websites used to track packages through FedEx or U.S. Postal Service at least 99 times. The laptop also contained information within the Google Chrome web browser used to

automatically fill in profiles on websites visited. The information for the stored profile contained several phone numbers all tied to FINUCAN's name. The communication history of these phone numbers revealed several calls to JOHNSON.

### FINUCAN's Continued Criminal Activity

49.     In July of 2018, ATF became aware that Detectives with the Fairfax County Police Department (FCPD) were conducting controlled purchases of cocaine base from a known individual. FINUCAN had been present on multiple occasions where the known individual sold cocaine base to a confidential informant. On July 26, 2018, FCPD arranged a purchase of cocaine base from the known individual and ATF assisted with surveillance. After arriving in the area, the confidential informant met with FINUCAN, who sold the confidential informant a small quantity of cocaine base.

### Recent Surveillance of JOHNSON and FERRELL

50.     On June 19, 2018, FERRELL was observed exiting 604 N. Columbus Street in Alexandria, Virginia. FERRELL then retrieved items from a cargo van. FERRELL then placed items into a different, white cargo van. FERRELL was also observed going to a gray Saturn SUV prior to leaving the area in the white cargo van.

51.     Later on June 19, 2018, The white cargo van was observed parked at 31 Stanley Loop, Fredericksburg, Virginia. This address is owned by FERRELL, but is occupied on a daily basis by JOHNSON and JOHNSON's wife and children. FERRELL and JOHNSON were observed exiting the residence and departing in the white cargo van. FERRELL and JOHNSON travelled to an address in Stafford, Virginia and entered a townhouse at that location. While on the way to the location, FERRELL drove below the posted speed limit on the interstate and made two different u-turns. Based on my training and experience, I know these driving behaviors to be

16

common counter-surveillance techniques used by individuals who are attempting to discover if they are being followed by law enforcement.

52.     After 30 minutes, FERRELL and JOHNSON returned to the white cargo van and left the area. They then travelled to Quality Tire located in Woodbridge, VA. They drove directly to the rear of the business, which is not the location where the general public accesses the business. JOHNSON and FERRELL entered the business through a rear door. FERRELL then returned to the van, repositioned it, and opened the rear doors. FERRELL and JOHNSON's movements indicated that they were either loading or unloading items between the van and the business. Approximately 25 minutes after they arrived, FERRELL departed alone in the white cargo van. JOHNSON was later observed returning to 31 Stanley Loop in a white Land Rover SUV.

53.     On August 3, 2018, law enforcement learned through the monitoring of location data that JOHNSON travelled to Atlanta, Georgia. JOHNSON's location data showed him in the area of 3629 Sherbrooke Circle, Woodbridge, Virginia until approximately 4:30 AM, when he began travelling south on Interstate 95. Law enforcement was also able to discover that JOHNSON had rented a silver Kia Soul on August 2, 2018 from a Hertz located in Woodbridge, Virginia. Law Enforcement was able to review surveillance video from the Hertz where JOHNSON rented the vehicle. Law enforcement observed that JOHNSON was dropped off by an unidentified male individual, and also saw JOHNSON load multiple large items into the trunk of the rental vehicle before leaving the location. Hertz staff also advised that JOHNSON requested a vehicle with larger storage capacity. Later on August 3, 2018, location data for JOHNSON showed him in the area of the Sonesta ES Suites located at 760 Mount Vernon

17

Highway, Atlanta, Georgia. Law enforcement was able to confirm the Kia Soul JOHNSON rented was in the parking lot of the location.

54.     On August 10, 2018, location data for JOHNSON indicated that he was travelling back into the northern Virginia area. Law enforcement was able to locate JOHNSON's rental vehicle travelling northbound on Interstate 95 in Stafford, Virginia. Phone records revealed that JOHNSON contacted FERRELL as he approached the northern Virginia area. The vehicle was followed to the Lowes located in Woodbridge, Virginia. JOHNSON was observed exiting the vehicle and entering the Lowes accompanied by a young female child. An adult female was also observed exiting the rental vehicle, but she remained in the parking lot. JOHNSON then returned to the rental vehicle with the child after making a purchase in the Lowes. The adult female was already in the rental vehicle and they departed with JOHNSON operating the vehicle.

55.     JOHNSON then travelled to a Sheetz located at 4021 Prince William County Parkway, Woodbridge, Virginia. He parked the rental vehicle at a gas pump directly next to FERRELL, who was putting gas in a white Chrysler minivan. JOHNSON immediately exited the driver's seat of the rental vehicle with a bag and placed it in the front passenger side of minivan. JOHNSON then returned to the rental vehicle and retrieved a large white bag from the trunk of the vehicle and placed it into the minivan. JOHNSON then returned the rental vehicle again before entering the front passenger seat of the minivan. The adult female from the rental vehicle got into the driver's seat and departed. Law enforcement observed the rental vehicle return to 3629 Sherbrooke Circle short time later, and the female entered the residence with the young child. FERRELL and JOHNSON departed the Sheetz in the minivan.

56.     Law enforcement surveilled the minivan from the Sheetz to 12905 Kerrydale Road, where FERRELL was observed entering the residence carrying a backpack. There was

18

another individual with FERRELL as he entered the residence that could not be identified at the time. Approximately one hour later, FERRELL and JOHNSON were observed exiting 12905 Kerrydale Road and returning to the minivan. FERRELL was carrying the same backpack he had when he entered the residence and JOHNSON was carrying a large white bag. They then departed in the minivan and travelled to the parking area outside of 3629 Sherbrooke Circle. While on the way to this address, FERRELL and JOHNSON used back streets and indirect routes. Based on my training and experience, I know this to be a common counter surveillance technique used by individuals trying to ascertain whether they are being surveilled by law enforcement.

57.     After arriving in the area of 3629 Sherbrooke Circle, JOHNSON exited the vehicle, but remained at the passenger side and appeared to be conversing with FERRELL who remained in the vehicle. JOHNSON had a large white bag in his hand and remained in that position for approximately 30 minutes before exiting the area on foot. FERRELL then departed the area in the minivan.

58.     Law enforcement surveilled FERRELL as he travelled back to the area of his residence at 604 N Columbus Street, Alexandria, Virginia. While on the way to this location, FERRELL pulled into a gas station, slowly circled the lot and then exited and continued travelling in the same direction. Based on my training and experience, I know this to be a common counter surveillance technique used by individuals trying to ascertain whether they are being surveilled by law enforcement. When FERRELL arrived in the area of his residence, he pulled into the alley behind the location and stopped in the area where the cargo van and white work van were parked. FERRELL then exited the white minivan and appeared to be moving items between white minivan and one or both of the other vans. FERRELL then drove around to

19

the front of his residence in the white minivan and stopped briefly before quickly accelerating and leaving the area. Approximately three minutes later, FERRELL returned in the white minivan, parked in front of the residence, and entered 604 N Columbus Street.

### Conclusion

59.        Based on the foregoing paragraphs, I submit that there is probable cause that from in and around March 2017, and continuing through the present, in Prince William County and elsewhere, Maurice JOHNSON, Bryan FERRELL, and Kathleen FINUCAN have engaged in a conspiracy to distribute five kilograms or more of cocaine in violation of Title 21 United States Code 846 and Title 21 USC 841(a)(1). I therefore, respectfully request that the court issue arrest warrants charging Maurice JOHNSON, Bryan FERRELL, and Kathleen FINUCAN with these violations.

Respectfully submitted,

_____

Zachary Mikkelson
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

SUBSCRIBED and SWORN to before me on _____, 2018.

_____

The Honorable Theresa Carroll Buchanan
United States Magistrate Judge

20